UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,        CRIMINAL NO. 12-CR-20598

v.                              HONORABLE SEAN F. COX

                                  VIOLATION: 18 U.S.C. § 1343, Wire Fraud

D-1 MICHAEL WINANS, JR.,

        Defendant.
_____/

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its attorneys, Barbara L. McQuade, United States Attorney, and Abed Hammoud, Assistant United States Attorney, respectfully recommends that the Court impose a sentence of imprisonment within the Guideline range calculated in the Presentence Investigation Report (PSR): 151 to 188 months.

**I.    FACTUAL BACKGROUND**

From approximately October 2007 through September 2008, in the Eastern District of Michigan, Southern Division, MICHAEL WINANS, Jr. (D-1) operated the Winans Foundation Trust (the Trust) and represented that the Trust was a company investing in crude oil bonds in Saudi Arabia. He initially recruited eleven individuals, whom he called "shareholders" in the Trust, to invest in the crude oil bonds. He required the "shareholders" (i) to solicit additional investors; (ii) to incorporate businesses to hold the funds provided by the investors they solicited; and (iii) to send the investors' funds to the Trust. Victim investors resided in the

States of Michigan, Arkansas and Georgia, among other places.

As early as December 2007, WINANS became aware that the Saudi Arabian crude oil bond did not exist as an investment vehicle. Yet, he did not disclose this fact to existing investors and, with the intent to defraud, continued to solicit funds for the Trust. Each individual victim of WINANS' scheme to defraud invested several thousand dollars in the Saudi Arabian crude oil bond. As a result, defendant obtained over $8,000,000 from more than 1,000 victim investors, all of whom were led to believe they were investing in Saudi Arabian crude oil bonds that defendant well knew did not exist. Defendant WINANS guaranteed the victim investors that the bonds would yield returns of approximately 100% of the principle within 60 days. He then deposited the victim investors's funds into his own bank accounts. He falsely explained to the victim investors that their funds had to be deposited into his account because the Saudi Arabian crude oil bonds were not being publicly traded.

WINANS then converted some of the victim investors' money to his own personal use. In addition, in classic "Ponzi-scheme" fashion, defendant gave some of his later victims' money to his earlier victims, and falsely represented to them that it was the return on their "investments" he had promised. Further, defendant made fraudulent material representations and promises to his victim investors who requested a return on their funds, lulling them with false explanations that their money was secure but temporarily unavailable.

In executing his scheme to defraud, WINANS made or caused to be made interstate wire transmissions, including sending emails to out of state victims and depositing their checks into his bank account.

## II.     SENTENCING GUIDELINE CALCULATIONS AND § 3553(a) FACTORS

In determining an appropriate sentence, district courts are to consider the factors set forth in 18 U.S.C. § 3553(a). *See United States v. Booker*, 543 U.S. 220, 264 (2005). "The Guidelines should be the starting point and the initial benchmark in determining a sentence and a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007) (quoting *Gall v. United States*, 128 S.Ct. 586, 601 (2007) (internal quotations omitted)). "Sentences falling within the applicable Guidelines range are afforded a rebuttable presumption of reasonableness." *Id*. at 770.

In determining the appropriate sentence, the Court should not simply rely on the Guidelines calculations, but should consider all of the factors in the Sentencing Reform Act and, in particular, those set forth in 18 U.S.C. § 3553(a). These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; . . . (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty; and (7) the need to provide restitution to any victims of the offense.

### A. Sentencing Guidelines

#### 1. Guidelines Calculation

The government agrees with the Probation Department's calculation of the Guideline range which is the same as in the Rule 11 signed by the parties, **151-188 months**. It therefore urges the Court to adopt this range. *See* PSR at ¶ 65.

### B. Sentencing Reform Act Factors

#### 1. The Seriousness of the Offense

This was not a crime of opportunity. Defendant's fraudulent scheme occurred over the course of several years and consisted of a very calculated and thought-out conduct aimed at using his position of trust with people he knew directly or through his friends. Defendant clearly abused the fact that he came from a very well known family with a good reputation in order to induce people to invest with him. He also used religion to convince people to trust and invest with him. This translated into over eight million dollars of money obtained by fraud from so-called investors, which financially ruined many of them.

Defendant's criminal activity impacted hundreds of people financially, emotionally, and otherwise. Over 1,200 people "invested" in his pyramid scheme and more than 577 victims are still owed money. *See* PSR at ¶ 15 and ¶ 16. Several of these victims submitted a "Victim Impact Statement." The government urges the Court to consider these statements when it sentences the defendant. A few excerpts from different victims' statements are included below. These quotes do not constitute the entirety of what each victim submitted, but parts of what they wrote.

J. & P. G. from the State of Georgia wrote:

> My husband and I are victims of Michael Winans, Jr.'s ponzi scheme at the amount of $116,000 as of August 2007. We were personally associated with Mike long before this transaction took place so needless to say, we were devastated by this entire situation both financially and personally.
>
> We initially had no debt and had planned on being put in a position to maintain our children's educational expenses and other investment endeavors. We had to pause those efforts because of the failure of this supposed opportunity… We have not been able to enjoy life to the extent that we had grown accustomed to prior to this event… However, we have had to make grave sacrifices in the efforts to recover, all the while, I view pictures of Michael driving high priced cars, living a lavish life, and socializing with celebrity types via social media.
>
> As sentencing is considered, I [entrust] Judge Sean Cox to render Michael Winans, Jr. the maximum penalty as the law allows. Not because we want revenge for we have forgiven him but because there's been no symptoms of remorse. This was a callous and evil act based on greed and selfishness. He took advantage of trusting and unsuspecting people based on the reputation of his family name and the sincere hearts of a community of Christians familiar with that name, some of his own family members are even victims… In fact, those same pictures that he obviously posted on social media extravagantly demonstrated his utmost disrespect and total disregard to the financial and emotional harm he caused so many people.
>
> We are still in hopes of full restitution of all of our funds lost as expeditiously as possible.

T.B. wrote:

> To say my interaction with Micheal Winans had an effect on my life emotionally, mentally and financially would be a gross under statement. This Silver Tongue Con-man [used] his family name to give us a false sense of trust, that he was [an] upstanding person. Even went so far as to [stand] up in front of a church and [say:] "Would I be using this forum if I wasn't being truthful with you."

V. W., a family relative of defendant, wrote:

> Michael Winans, Jr. frequently stayed at my home, as he was best friends with his cousin and my son... He was also raised in the Christian Faith which he ultimately used against us! Michael, Jr. was my nephew by marriage… He was totally trusted by many because of our religious upbringing and his closeness to me, my sons, and my family…I work extremely hard and I would love to get mine and my family's money back! This traumatic crime has made my nerves terribly bad. Trying to keep my name out of the press and this whole messy situation have made me think and feel that Michael, Jr. was going to get away with this crime. I have no idea how much weight this letter will have on Michael's sentencing, but honestly I don't have the words to say how much sorrow, grief, pain, tears, fears, etc., Michael's blatant, knowing, and criminal activity has caused me and my family… He has shown NO remorse for this awful crime…

J.T. wrote:

> … I am a young girl who comes from an urban community where good opportunities don't come along very often. Perhaps this is why I jumped at the chance to be a part of what I now know was nothing more than a scheme that was put on by Michael Winans Jr. At the time, I was a college student who was looking to make some money in order to contribute to the cost of higher education. I was overjoyed to be able to make some extra money that would help pay for tuition, room and board, books, and all the other expenses that come along with a college education. It all came crashing down when I was informed that it was all a scam. **To some it may not seem like a lot of money but to me, it was everything.** It was my money that I worked so hard to save, that could have been used to support me during my struggle. Instead, it was wrongfully taken by a man who had no regards for how his selfish and illegal choices could affect the lives of others. I must admit I fell for his last name. Being a Christian girl and knowing that he came from a Christian family, gave me the confidence to entrust in him my money. (Emphasis added.)

L.G. was one of defendant's so-called "shareholders" who were recruiting other "investors" under the belief that this was a true and legitimate investment opportunity. She wrote:

> When this investment ended, it was probably one of the worst days of my life. My team and I alone had over 350 people totaling 2 million dollars. There were people who had put in over 10k (plus processing fees) for this investment. People took the buyout from the Big Three automakers, 401K's, Personal lines of credit, life savings, retirement funds, annuity funds some even took out equity loans almost losing their homes. People convinced their bosses on the job to invest which resulted in bad relationships and drama on the job. As a result, many people such as myself had to file [bankruptcy], marriages were in turmoil, marriages split apart, families were divided, friendships ended, threats evolved, people became physically ill due to stress and lack of finances… There were people of different cultures (I had a group of Russians invest with me) who had invested and believed that if anything were to happen to their money that the person handling their money specifically shouldn't live and consequently, that person handling their money was me because the money went from her hand to [mine]. Although the money went from my hands to his she was not trying to hear that because she gave me her money so I had to deal with the consequences if I didn't pay her money back. She had invested 20 thousand dollars (plus processing fees) and she told me that she would kill me if I didn't give her the money she invested plus processing fees and told me my address and that she would be at my house immediately.  I had to get all the money out my business and personal account in order to pay her back. I told him about it and he left me in the dust not returning my calls and I had to draw all my accounts empty to save my own life. … It One thing for sure people actually believed in it and trusted that it would work because of the top source who was Winans Jr. that it was coming from and the fact that his family members are millionaires…  It was so stressful, my father had several people invest their money and was sued so that caused he and I to part ways and my dad is my best friend so that hurt my heart, my mother was terminally ill at the time and suffered a stroke worrying about me and my father so we were back [and] forth to the hospital.

Clearly, defendant's crime is very serious and affected and continues to affect the lives of many individuals. The seriousness of this crime is also reflected in the maximum potential penalty of 20 years imprisonment and the sentencing Guidelines of 151 to 188 months. A sentence of imprisonment within the range suggested by the Guidelines is appropriate here.

### 2. Respect for the Law and Deterrence

In white collar prosecutions, the sentence imposed is important to promote respect for the law and to deter the defendant and general public from committing similar future crimes. Given the difficulties of uncovering and prosecuting this type of fraud, the deterrent impact of prison sentences is important to the mission of law enforcement and the financial integrity of the system. The Eleventh Circuit emphasized the important role that prison sentences have in deterring white collar crime in *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) when it recognized that "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (Internal quotation marks and alterations omitted.) With this in mind, a sentence of imprisonment within the Guidelines is warranted given the significant amount of monetary loss caused by the defendant and the number of victims involved. Approximately five million dollars are still owed to at least 577 victims, according to ¶ 75 of the PSR.

A custodial sentence within the Guideline range is appropriate given the magnitude of defendant's activities and his elaborate scheme. Indeed, the Sixth Circuit has stated that "[o]ne of the central reasons for creating the sentencing Guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008) (citations omitted).

### 3. Need to Avoid Unwarranted Sentence Disparities

An important sentencing consideration is the need to avoid unwarranted sentencing disparities amongst similarly-situated offenders. Imposition of a sentence within the advisory Guideline range best serves "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress "sought uniformity in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct" prior to the Guidelines. *Rita v. U.S.,* 127 S. Ct. 2456, 2464 (2007). Because "uniformity remains an important goal of sentencing," "Section 3553(a)(6) directs district courts to consider the need to avoid unwarranted disparities." *Kimbrough v. U.S.*, 128 S. Ct. 558, 573-74 (2007). The Guidelines "help to 'avoid excessive sentencing disparities,'" *Kimbrough*, 128 S. Ct. at 573-74, because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges," *Gall v. U.S.*, 128 S. Ct. 586, 599 (2007), and because most defendants are sentenced within the Guideline Ranges. "[T]o secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark," id. at 596, and "remain an essential tool in creating a fair and uniform sentencing regime across the country," *U.S. v. Cooper*, 437 F.3d 324, 331 (3rd Cir. 2006). Sentencing within the Guideline range avoids "creat[ing] a potential disparity in sentence for those convicted of [the same crime] in New Jersey, and across the country, based on little, if anything, more than the luck of which judge is assigned to a particular case." *U.S. v. Goff*, 501 F.3d 250, 261 (3rd Cir. 2007). Therefore, the United States respectfully requests that the Court impose a sentence of incarceration within the advisory Guideline range in this case.

4. **The Need to Provide Restitution to the Victims**

In most white collar crimes, restitution is an important component of the sentence imposed by the Court. The financial hardship caused by defendant WINANS to hundreds of people will never be fully stated and will most likely be underestimated despite the diligent attempts of all the parties, especially the investigating agency and the Probation Department. However, the victim impact statements submitted to the Court provide an insight as to the financial effect defendant's actions had on so many people. Many of the victims believe WINANS has hidden the money he took from them. Below are excerpts from some of the victim statements as they relate to restitution issues.

L.G. wrote:

> …There were false promises from Winans Jr. … of people getting their money back but it never happened. He took all my personal money from my 401K, personal lines of credit (thousands of dollars), everyone else's money and moved out of town… I don't want to keep living my life in fear over money that he stole for his own benefit. I am trying to move on with my life and regain my credibility and that is not fair to me. I have been dealing with this for almost 5 years. He needs to pay people back and let people know that all of this is his fought so that my life can go back to normal. Where did the money go? He talked about off shore accounts in New Mexico and getting personal safes.

E. M. wrote:

> … writing to express the hardship that I am still going through as a result of Michael Winans Jr. taking 21,000 dollars from me. As a result of losing that money, my house is in [foreclosure], I have no money in my savings account and my credit score has [plummeted] to below 600… I reside in Atlanta Georgia and unable to attend the sentencing. Please do all within your power to see that I am reimbursed and to compensate me for the strain that Mr.Winans has put in my life and my family's life.

L. V. G. wrote:

> I invested a total of $30,000.00 to Michael Winans Jr. and as a result of this [loss], I had to file bankruptcy and end my business, LVG Enterprises. I owned 6 rental properties and could not maintain them with the financial [loss]. This has had a tremendous impact on me emotionally as well. I am unable to purchase a home, and more importantly, I struggle to pay my student loans bill monthly. I would greatly appreciate if in addition to the sentencing of Michael Winans Jr., that I am returned all of the money that I invested.

M. E. wrote:

> I was convinced this was a totally safe investment. Michael Winans stood on church pulpits on several occasions and spoke about the crude oil investments and it was guaranteed that we would not lose on this and emphasis was put on the initial investment surely guaranteed. I used money I had in savings and borrowed on my charge cards to make these investments… Michael Winans, Jr. caused havoc and financial chaos in my life.

The parties agreed in the Rule 11 Plea Agreement that Defendant must be ordered to pay restitution as determined by the Court. According to the PSR, this restitution is estimated at $5,004,750 to over 577 victims. See PSR ¶ 75. This amount should be reflected in the judgment issued by the Court and the appropriate restitution amount should be paid by the defendant to each victim. Further, it is anticipated that, because of the publicity surrounding this case, more victims could come forward AFTER sentencing. Therefore, the government respectfully asks this Court to leave the possibility open for additional restitution to be ordered if more victims come forward with the appropriate documentation.

11

## **CONCLUSION**

For all of the above reasons, the government respectfully recommends that the Court impose a sentence of imprisonment within the Guideline range of **151 to 188 months** in prison and order restitution to the victims.

                              Respectfully submitted,

                              BARBARA L. McQUADE
                              United States Attorney

                              /s   Abed Hammoud
                              ABED HAMMOUD
                              Assistant United States Attorney
                              211 W. Fort St., Suite  2001
                              Detroit, Michigan  48226
                              Telephone:  (313) 226-9524
                              Facsimile:   (313) 226-2873
                              E-mail: abed.hammoud@usdoj.gov

Dated: February 20, 2013